S.R.L. 2013-2001. Ms. Dempsey, you are speaking without opposing counsel, so you use all of your 15 minutes without a break. I plead the court. The trial court erroneously substituted its interpretation of 19 U.S.C. section 1677 v. E2 v. E3 for that of commerce. This Chevron issue is similar to the one we recently appealed in Taimé v. United States in which this court overturned the trial court's determination in which the trial court required commerce to include below-cost sales and its constructed value profit. In doing so, this court upheld commerce's reasonable interpretation of the same statute which is at issue here, recognizing that there's a general statutory preference for sales of foreign-linked products made in the United States. The Court of International Trade really had a different view of this. It sent it back, what, three times? Yes. First of all, it disagreed with commerce's interpretation that commerce may exclude below-cost sales from the profit cap calculation. And in doing so, it based its decision on three things. First, it said that the requirements and language of the statute itself would not allow it to sustain commerce's exclusion of below-cost sales from the profit cap calculation. However, as a trial court— But the language was ambiguous, right? I'm sorry? The language of the statute's ambiguous. Correct. So that's why you rely on Chevron. That's right. And the trial court, in a later decision, in one of its remand orders, itself acknowledged that the statute doesn't speak to the question of how commerce is to calculate the profit cap. Can I just ask, I mean, the piece of the statute that sort of is part of the statute because of the statutory incorporation, if that's the right term, of the Statement of Administrative Actions, there's that sentence, there's a likewise sentence, that is effectively a piece of the statute. Why doesn't that support the CIT's view? I think the statement you're talking about is that the administration doesn't intend for commerce to engage in an analysis on whether sales in the same general category of merchandise  deals with sales in the same general category, which is not what commerce used in this particular case. In this particular case, commerce used sales of foreign-linked products. Moreover, the FAA was discussing how it didn't intend for commerce to have to go to other respondents and request additional profit information in order to conduct such an analysis because if not requested, that information would not be available on the administrative record because sales in the same general category encompass a much broader array of products which are not typically subject to the administrative review or investigation. I'm not sure I understand your first point there, that this has to do with something that doesn't pertain to subsection 3, the statute, 1677 B.E.B. 3. Let's call it Romanet 3. The statute. The statute. Well, there are several different things, but if we can just refer to it as Romanet 3, that would make it the least clear to me. Romanet 3 does seem, with respect to the profit cap, to refer to merchandise that is in the same general category. That's correct. So why doesn't that fit right in with the sentence from the FAA? It does fit, but... Because the FAA is saying, do not look, we will not look at the question of whether something is below cost or not, with respect to sales in the same general category. That seems to be this exact language from Romanet 3. Right, but in this particular case, the FAA also states that commerce will determine the profit cap on a case-by-case basis. In this particular circumstance... Before you run off from there, your answer to Judge Serrano's question, I thought, was well, this sentence has nothing to do with the profit cap because it's dealing with general category product. But that can't be right, right? It does deal with the profit cap, definitely it does. Okay. But it deals with the profit cap when the profit cap is based on data of sales in the same general category. In this case, commerce didn't have data of sales in the same general category. It had sales of foreign-linked products from the respondents in the prior administrative review. And so, unlike sales in the same general category, commerce already had evidence and data on the record to exclude below-cost sales, which is the basis of this Court's decision in Tie M.A. In Tie M.A., this Court upheld commerce's exclusion of below-cost sales from the constructed value profit because of two reasons. One was that data was available on the record, which this Court recognized as an important factor in commerce's exclusion of below-cost sales from its calculations. Let me ask you to comment on a previous decision of this Court. You didn't cite it in your brief, and of course, we don't have a brief from the other side. But it is cited in the materials you provided to us, and I'm sure you're familiar with it. SKF against U.S. 263 F.3rd 1369. Ring a bell? Yes, it does. Okay. Well, let me just ask you to comment then on this language from that case. It's a decision of ours. It's not a CFPK. Use of the methodology set forth in subsections B.1 and B.3, that's from Annette 3, of section 1677 B.E. 2, of course, would require the inclusion of below-cost sales in the constructed value profit calculation. Isn't that pretty much contrary to the position you're taking? I'm sorry. I'm not exactly familiar with that particular language. However, if in that— Well, I mean, there's nothing more to it than what I just read. Okay. Can you read it again? Sure. I'll read it again. Use of the methodology set forth in subsections B.1 and B.3 of section 1677 B.E. 2, of course, would require the inclusion of below-cost sales in the constructed value profit calculation. Now, Commerce, in one of its determinations, cited the case as being supportive of the exporter's position, but didn't go ahead and distinguish it. They just said, that's a case cited by the exporter as part of the exporter's presentation. And I want to know if you have an answer for why that case doesn't seriously undermine your position. Well, I'm not sure whether MPM actually addressed the profit cap issue or if the data that was used in that particular case was sales in the same general category. The statute's legislative history in Congress intended that Commerce would apply option three on a case-by-case basis. And so each case is different based on the available data that Commerce has at its fingertips to calculate ATAR's profit cap. Because ATAR, in this case, didn't have a home market. It didn't have a viable home market. So essentially what it had to do was create a constructed value of ATAR's profit experience. And in doing that, it reasonably took the only available data it had on the record, which was the prior review respondent's data, and it used the profit rates actually calculated for those respondents as ATAR's profit cap. And in doing so, it reasonably interpreted the profit cap to be an amount that the Italian pasta producers actually realized. And that is essentially what they applied for those respondents. The trial judge took a different view of the reasonableness, even in his last opinion in which he said, okay, you know, Cai, I may, gives Commerce a lot of discretion in the Roman at three cases. But still, there has to be substantial evidence to support the methodology that Commerce chose and whether that methodology achieves a reasonable measure of the profit to calculate the profit cap. And concluded that it didn't because in this seemingly unusual case, four out of the six producers had no profit. Right? So why isn't it reasonable to say that when you have a case in which the vast majority or the significant majority of the data is of below-cost sales, that you don't treat those sales as anomalous, or at least it's unreasonable, perhaps on the facts of this case, to treat those sales as anomalous and therefore not to be considered? That's precisely Commerce's position, is that the below-cost sales should not be considered. No, no, I'm saying why shouldn't they be considered since they're not, we have established by virtue of the fact that that's most of the sales, that those sales are not anomalous within the Italian pasta industry. Because for those respondents themselves who actually had whole market sales, unlike ATAR, the statute required Commerce to exclude those below-cost sales in calculating their profits, their profit rates, as the respondents' profit experience. But you're not suggesting that statute required that for profit cap calculation, are you? Well, that is how Commerce reasonably interpreted the profit cap is defined in the statute to be an amount normally realized by exporters. Is it your view that an amount allowed for profit has to consist of profits rather than losses? Just interpreting the statute? Well, interpreting the statute, we're going back to what, you know, throughout the trial court's various remand determinations, Commerce had to recalculate the profit cap a couple times. But what we really, our position stems back to its final determination where it calculated the profit cap using only above-cost sales, which is how Commerce normally calculates profit rates when data is available and it uses its normal profit rate calculations. There's also a preferred methodology which Commerce uses even before it resorts to this option 3 when it has no available data on the record to calculate ATAR's profit cap or profits. But the amount normally realized, is realized limited to profits or does it relate to sales? Well, it depends on the circumstances of the case, but normally realized under normal circumstances when a respondent has home market sales, that particular statute states that Commerce must disregard low-cost sales. And that is the method that Commerce was required to use when it calculated the profit for the respondents in the prior review and whose data Commerce used directly to calculate ATAR's profit cap. But pointedly, that applies to, I guess it's A and B, Commerce 2, but that language is missing from Romanet 1 and Romanet 3, correct? That's correct. So, and then when I look at the preamble to the department's regulations, I find language such as saying that the department believes that the automatic exclusion of below-cost sales would be contrary to the statute. What I'm struggling with is it sounds to me like what you're saying is that the statute effectively not only invited Commerce, but virtually forced Commerce to exclude the below-cost sales in Romanet 3 cases. That's not entirely correct. Let me ask you this question. Has Commerce ever, in a Romanet 3 case, included below-cost sales? Yes, it has. In the Florida Trade Council, it's a part of the international trade case, Commerce had to resort to sales in the same general category, unlike our case, which we relied on sales of foreign-like products. And because there is no particular sales-specific data with respect to sales in the same general category, Commerce had to include all of the below-cost sales that were made, and so the profit cap there was zero. Okay, I interrupted you. You were getting ready to respond. I'm sorry. You know you've forgotten the question, and you know what? So have I. Maybe I deserve what I get, unless it's not an answer to the question that I have now forgotten. I think maybe one version of it might be, in what way, if any, is Commerce's position different from a position that essentially reads the surrounding provisions as pretty much mandating the exclusion of below-cost sales under Romanet 3? Well, the statute's legislative history addressed Option 3 in a sense that it says that Commerce can, you know, must consider each situation on a case-by-case basis. And so in this case, Commerce did not automatically exclude below-cost sales. It did so because it had to rely on data from the prior review in which it calculated profit rate in a statutorily mandated way, which excluded below-cost sales. So it basically lifted the prior review respondent's profit experience and applied that as ATAR's profit experience because ATAR didn't have a viable whole market. So there was no automatic exclusion. However, if Commerce relied not on, let's say, the sales of some online product made by respondents, but instead relied on sales in the same general category, it wouldn't have excluded below-cost sales from the calculation. I see I'm almost out of time. Finish your answer. I've finished. That answers the question. All right, thank you, Ms. Dempsey. I don't know whether it's been a benefit to you to have had no opposition or whether it's a detriment that you've had to keep talking. At any event, we'll take the case and revise it.